UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ASSEMBLY SQUARE LIMITED PARTNERSHIP, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 04CV10093(EFH) ) |
| KMART CORPORATION, | ) ) |
| Defendant. | ) ) ) |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, Kmart Corporation ("Tenant" or "Kmart") respectfully submits this Statement of Undisputed Facts In Support of Its Motion For Partial Summary Judgment (the "Statement") in accordance with this Court's Local Rule of Civil Procedure 56.1.

1.      Landlord submitted a purported Delinquency Schedule as support for the filing of this summary process action for possession and money damages noting fourteen itemized items believed owed.  That Delinquency Schedule is attached as Exhibit A to the Declaration of Kristen Hanisch Mansharamani ("Mansharamani Decl.").  All but Items 13 and 14 are part of the amount claimed in the Notice of Default, paragraph 62 *infra*.  The Notice of Default aggregated rather than itemizing the amounts claimed in default and, therefore, did not contain the necessary detail found in the Delinquency Schedule.

2.      On December 5, 1978, Kmart and East Bay Development Corporation entered into a lease concerning certain property located at the Assembly Square Mall in Somerville, Massachusetts (the "Lease").  The Lease is attached as Exhibit B to the Mansharamani Decl.

1

3.     On October 1, 1998, Assembly Square Limited Partnership ("Assembly Square"

or the "Landlord") assumed the obligations of East Bay Development Corporation under the

Lease. Notice to Kmart of Assignment and Assumption, attached as Exhibit C to the

Mansharamani Decl.

4.     Under the Lease, the Landlord is required to maintain the outdoor Common Area

and the Landlord's responsibilities with respect to the maintenance and upkeep of the Common

Area include:

> repairing and replacing paving; keeping the Common Area property policed and
> secured, drained, free of snow, ice, water, rubbish and other obstructions, and in
> an neat, clean, orderly and sanitary condition; keeping the Common Area and
> such other areas suitably lighted during, and for appropriate periods before and
> after, Tenant's business hours; maintaining signs, markers, painted lines (painting
> lines at least once in each Lease Year) and other means and methods of pedestrian
> and vehicular traffic control; maintaining adequate roadways, entrances and exits;
> and maintaining any plantings and landscaped areas.

Mansharamani Decl., Exhibit B, Art. 9, ¶B.

5.     Landlord is required to "keep Tenant insured against all statutory and common

law liabilities for damages on account of damage to property or injuries and loss of life sustained

by any person or persons within said Common Area, including the enclosed mall."

Mansharamani Decl., Exhibit B, Art. 9, ¶G.

6.     Tenant must be notified "not less than ten (10) days in advance of any

modification or cancellation" of the insurance policy which Landlord is required to maintain.

Mansharamani Decl., Exhibit B, Art. 9, ¶G.

7.     A rider to the Lease entitled "Tenant's Common Area Charge" (the "CAM

Rider") requires Kmart to reimburse the Landlord for the Landlord's expenses required under

Article 9 of the Lease for maintenance and operation of only the *outdoor* Common Area, subject

to explicit exclusions. Mansharamani Decl., Exhibit B, CAM Rider, ¶A.

2

8.      The Lease was amended by the "Tri-Party Agreement and First Amendment to Lease Agreement" on September 7, 1999 ("First Amendment"). Under the First Amendment, Landlord is entitled to obtain the estimated reimbursements that will be due for Landlord's expenses by collecting from Kmart monthly CAM escrow payments in an amount representing 1/12 of the Landlord's estimate of total CAM charges allocable to Kmart as determined and reconciled at the end of the year. First Amendment, attached to the Mansharamani Decl., Exhibit D, ¶26.

9.      The Lease specifically denies Landlord any right to seek reimbursement from Kmart for "public liability insurance." Mansharamani Decl., Exhibit B, CAM Rider, ¶A.

10.     The Lease specifically denies Landlord any right to seek reimbursement from Kmart for "office overhead or salaries of persons whose functions extend beyond the care of the outdoor Common Area." Mansharamani Decl., Exhibit B, CAM Rider, ¶A.

11.     The Lease specifically denies Landlord any right to seek reimbursement for "removal of rubbish of individual tenants" and for "parking lot patching, repairing, and replacement." Mansharamani Decl., Exhibit B, CAM Rider, ¶A.

12.     In the 1999 Common Area Maintenance Charge Reconciliation ("1999 CAM Reconciliation") Landlord initially sought reimbursement from Kmart for an insurance premium amount of $11,364.00. Affidavit of Patricia Briskey ("Briskey Aff."), ¶ 3, Exhibit 1.

13.     The 1999 CAM Reconciliation included as supporting documentation for Kmart's review one hundred and eighty three (183) pages (Briskey Aff., ¶2) but only a single page insurance premium invoice which described the coverage as the "Commercial Package" for Assembly Square Mall for the policy period 1/1/99 to 1/1/00. The total invoice amount of

3

$11,364.00 corresponded to the amount charged to Kmart as reimbursable Common Area expenses. Briskey Aff.,¶ 4, Exhibit 1.

14.    In the 1999 CAM Reconciliation Landlord initially sought reimbursement from Kmart for a portion of the Property Manager's salary in the amount of $19,687.75. Briskey Aff.,¶ 5, Exhibit 1.

15.    The 1999 CAM Reconciliation included only one page of supporting documentation with regard to the property manager salary expense for Kmart's review. This page, entitled Wage & Benefits Allocation of Maintenance Personnel 1999, showed that Landlord had included 25% of "Maintenance Personnel" salary and benefits and had calculated that amount to be $19,687,75 – the amount listed as Property Manager salary allocated to Kmart on the 1999 CAM Summary spreadsheet. Briskey Aff., ¶ 6, Exhibit 1.

16.    For at least the five years of CAM Reconciliations prior to the 1999 CAM Reconciliation, it had not been the practice of Landlord's predecessor-in-interest or Landlord, to allocate any amount for insurance to Kmart as a CAM charge in the CAM Reconciliations, as demonstrated by the absence of an insurance line item in the summary of expenses allocable to Kmart in each of the 1994 to 1998 CAM Reconciliations. Briskey Aff., ¶ 7, Exhibits 2 to 5.

17.    For at least the five years of CAM Reconciliations prior to the 1999 CAM Reconciliation, it had not been the practice of Landlord's predecessor-in-interest or Landlord, to allocate any amount for the property manager's salary to Kmart as a CAM charge in the CAM Reconciliations, as demonstrated by the absence of a property manager line item in the summary of expenses allocable to Kmart in each of the 1994 to 1998 CAM Reconciliations. Briskey Aff., ¶ 7, Exhibits 2 to 5. Rather, the maintenance staff salaries were distinct from the salary of the property manager as demonstrated, for example by the 1998 CAM Reconciliation, which

4

contains a cover letter itemizing the costs billed to Kmart and supporting documentation including the entire Schedule of Common Area Costs to Landlord for Calendar Year 1998. In the latter Schedule of Common Area costs, it is possible to see that when the Landlord assumed the property, under the administration of National Development, the Maintenance Payroll is separate from the Property Manager Payroll with a portion of Maintenance Payroll allocated to the outside (exterior) common area. Briskey Aff., ¶ 8, Exhibit 5.

18.     The CAM Rider provides that "[a]s soon as is practicable after the end of each calendar year (or period) Landlord shall submit to Tenant a bill for the amount required to be paid by Tenant under this Rider, setting forth *in reasonable detail the items and amounts included in*, and setting forth the *method of calculating*, Tenant's Common Area charge." Mansharamani Decl., Exhibit B, CAM Rider, ¶ D (emphasis added).

19.     Landlord, through Landlord's agent, understood a lease provision such as the one set forth in the foregoing paragraph exists, at least in part, "to enable the tenant to determine that its CAM liability has been properly calculated by the Landlord." Excerpted Transcript of Deposition of Michelle Campagna, attached to Mansharamani Decl. as Exhibit E, ("Campagna Depo."), Vol. 1, pgs. 51 - 52, lns. 23 - 21.

20.     Given the explicit exclusion in the Lease of reimbursement of public liability insurance referenced in paragraph 9, and given the requirement referenced in paragraph 7 that any reimbursements that the Landlord seeks to collect be reimbursements for expenses associated with the outdoor Common Area, Kmart clearly understood based on the express terms of the Lease that it was not responsible for any portion of an insurance premium *not allocated* to damage to physical property structures in the *outdoor* common area. Briskey Aff., ¶ 9.

5

21.    Kmart was never provided with a 1999 CAM Reconciliation including supporting documentation that demonstrated for 1999 that nothing more than the cost of property insurance for the outside common area was allocated to Kmart in the insurance premium. Briskey Aff., ¶ 4.

22.    The insurance amount of $11,364.00 billed to Kmart in the 1999 CAM Reconciliation *did include* amounts representing premiums for the property insurance for the *entire* Assembly Square Mall including the *interior portion* of the mall. It was not limited to the outdoor common area portion of the mall, or the Common Area as defined in the Lease and referenced in paragraph 3 above. Excerpted Transcript of Deposition of Malcolm Baker, attached to the Mansharamani Decl. as Exhibit F, ("Baker Depo."), pgs. 77-78, lns. 15 – 12.

23.    Given the explicit exclusion in the Lease of reimbursement of office overhead or salaries of persons whose functions extend beyond the care of the outdoor Common Area referenced in paragraph 10, and given the requirement referenced in paragraph 7 that any reimbursements that the Landlord seeks to collect be reimbursements for expenses associated with the outdoor Common Area, Kmart clearly understood based on the express terms of the Lease that it was not responsible for any portion of the Property Manager's Salary because Kmart understood that the Property Manager's functions were both office overhead functions and extended beyond the care of the Assembly Square Mall outdoor Common Area. Briskey Aff., ¶ 10.

24.    The property manager position, in fact, *did involve* functions that extended beyond the care of the outdoor common area and even extended beyond the care of all of Assembly Square Mall. Malcolm Baker, as property manager, took care of several properties during his tenure as an employee of Landlord's management company. In 1999, his duties

extended to the entire interior and exterior and office functions of two properties. Mansharamani Decl., Exhibit F (Baker Depo.), pgs. 65 – 68, lns. 23 – 5.

25.    Kmart notified Landlord, in a letter dated April 24, 2001 from Joyce DiFalco, Kmart Lease Administrator, to the attention of Malcolm Baker, that Kmart disputed the insurance expense of $11,364.00 and the property manager expense of $19,687.75. Based upon these disputed items, Kmart recalculated the CAM Reconciliation and determined that it was owed a credit of $9,320.16, by Landlord. Briskey Aff. ¶ 11, Exhibit 6.

26.    The CAM Rider provides further that "*[u]nless disputed*, Tenant shall pay said amount to Landlord as additional rent within thirty (30) days after receipt thereof." Mansharamani Decl., Exhibit B (Lease), CAM Rider, ¶ D.

27.    Not until March 22, 2002 did Kmart receive any response regarding its calculation of a credit of $9,320.16 owed because of the disputed inclusion of an insurance premium amount and property manager's salary amount in the 1999 CAM Reconciliation. On March 22, 2002, Kmart received a letter from Malcolm Baker, of National Development for Landlord, Assembly Square LP, acknowledging Kmart's dispute over the two line items at issue and accepting Kmart's calculation of $9,320.16 due Kmart for overpayment of 1999 CAM charges. Briskey Aff., ¶ 12, Exhibit 7. Mr. Baker has testified that the only logical reasons he could remember for acknowledging Kmart's dispute were that he believed Kmart was right or he thought that it was not an issue worth fighting over. Mansharamani Decl., Exhibit F, pgs. 140-141, lns. 12 – 6.

28.    Malcolm Baker's letter of March 22, 2002 also revised the original 2000 CAM Reconciliation which Mr. Baker had submitted to Kmart on July 26, 2001. Briskey Aff., ¶18, Exhibit 7.

29.     Landlord's original 2000 CAM Reconciliation, like the 1999 CAM Reconciliation but unlike the CAM Reconciliations for prior years, included an allocation to Kmart for insurance expense of $11,062.00 and an allocation for property manager's salary of $11,130.46. Briskey Aff., ¶14, Exhibit 8.

30.     The 2000 CAM Reconciliation included as supporting documentation for Kmart's review only one insurance premium invoice, which described coverage as the "Commercial Package" for Assembly Square Mall for the policy period 1/1/00 to 1/1/01. The total invoice of $11,062 corresponded to the total amount treated as an expense allocable to Kmart. Kmart was never presented with a CAM Reconciliation for 2000 in which the cost of property insurance for only the outside common area was included in the expenses allocable to Kmart. Briskey Aff.,¶ 15, Exhibit 8.

31.     The insurance amount of $11,062.00 billed to Kmart in the 2000 CAM Reconciliation *did include* amounts representing premiums for the property insurance for the *entire* Assembly Square Mall including the *interior portion* of the mall. It was not limited to the outdoor common area portion of the mall, or the Common Area as defined in the Lease and referenced in paragraph 3 above. Instead, it purportedly excluded only liability insurance. Mansharamani Decl., Exhibit F (Baker Depo.) pg. 111, lns. 14-20; pgs. 144-146, lns. 8 – 3.

32.     The 2000 CAM Reconciliation included as supporting documentation for Kmart's review only one page entitled Wage & Benefits Allocation of Maintenance Personnel 2000, showing that Landlord had included 25% of 52% (or 13%) of "Maintenance Personnel" salary and benefits and had calculated that amount to be $11,130.46 – the amount listed as Property Manager salary allocated to Kmart on the 2000 CAM Summary spreadsheet. Briskey Aff., ¶ 16, Exhibit 8.

33.    The property manager position, held by Malcolm Baker, in fact, *did involve* functions that extended beyond the care of the outdoor common area and even extended beyond the care of all of Assembly Square Mall.  In 2000, Malcolm Baker's duties extended to the entire interior and exterior and office functions of four properties.  Mansharamani Decl., Exhibit F (Baker Depo.), pgs. 101 -102, lns. 21 – 5; pg. 107, lns. 9 - 14.

34.    Kmart notified Landlord, through Malcolm Baker, Property Manager, in a letter dated September 27, 2001 from Joyce DiFalco, Kmart Lease Administrator, to the attention of Malcolm Baker, that Kmart disputed the insurance expense of $11,062.00.  Based upon this and other disputed items, Kmart recalculated the CAM Reconciliation and determined that it was owed a credit of $30,153.66 by Landlord for 2000 and a continuing credit of $9,230.16 for 1999. Briskey Aff., ¶ 17, Exhibit 9.

35.    Mr. Baker, on March 22, 2002 revised the 2000 CAM Reconciliation so as to exclude insurance, among other things, in accordance with Kmart's understanding.  Though Mr. Baker agreed with Kmart on the exemption of insurance among other items, Mr. Baker calculated a credit due Kmart for 2000 CAM charges of $29,987.29 based on a re-allocation mid-year of the square footage of the Assembly Square Mall occupied by Kmart.  Kmart does not dispute this method of re-calculating.  Briskey Aff., ¶ 18, Exhibit 7.

36.    In the same March 22, 2002 letter, Mr. Baker revised the 2001 CAM Reconciliation so as to exclude the insurance expense allocation and the property manager salary allocation, thereby resulting in Mr. Baker's calculation of a credit due Kmart of $14,941.09 based upon Mr. Baker's calculation of the CAM escrow payments already made by Kmart. Briskey Aff., ¶ 19, Exhibit 7.  Kmart does not dispute Mr. Baker's method of calculating the credit due Kmart for the 2001 CAM charges; however, in the backup 2001 CAM Payments

9

spreadsheet attached to Mr. Baker's March 22, 2002 letter, Mr. Baker incorrectly assumed that Kmart ceased paying at the escrow rate of $3,954.70 monthly by August of 2001. Briskey Aff., ¶ 20, Exhibit 7.

37.    In fact, Kmart made escrow payments of $3,954.70 through November of 2001. Briskey Aff., ¶ 21, Exhibit 10. Therefore, the total Kmart CAM escrow payments paid to Landlord for 2001 were $43,501.70. This amount should be subtracted from Kmart's total "Tenant's Annual Expenses" column of the spreadsheet to yield a credit of $19,254.89. Briskey Aff., ¶ 22.

38.    The total aggregate credit due Kmart at the end of 2001, taking into account Malcolm Baker's re-calculation based on the slight change in square footage, was $58,472.34. Briskey Aff., ¶ 22.

39.    On December 1, 2001, Kmart began withholding CAM monthly escrow payments. Briskey Aff., ¶ 23.

40.    On July 26, 2001, prior to the March 22, 2002 resolution of the issues of allocation of insurance expense and property manager's salary, Landlord notified Kmart that it was due a credit of $30,013.80. Briskey Aff., ¶ 24, Exhibit 8. In addition to Landlord's calculation of a credit remaining from 1999 of $391.31 (Exhibit 1 attached to Briskey Aff.), Landlord's total credit as of July 26, 2001 recorded as due and owing to Kmart was $30,405.11. Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 2 pgs. 70-71, lns. 15 - 4.

41.    Despite the claim made by Landlord in writing that Landlord was enclosing a check in the amount of $30,013.80 with Landlord's July 26, 2001 letter, no check was ever sent to Kmart for this credit. Briskey Aff., ¶ 24, Exhibit 8.

10

42.     When Kmart ceased making CAM escrow payments in December 2001, Landlord

amortized Kmart's $30,405.11 credit over the period from December 2001 through December

2002 when the credit was "spent" according to Landlord's calculations. Briskey Aff., ¶24;

Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 2 pgs. 87 - 88, lns. 1 - 9.

43.     Landlord never amortized the remainder of the credit due Kmart in accordance

with Landlord's March 22, 2002 admission by Malcolm Baker.  The remainder of that credit -

$58,472.34 less $30,013.80 reported in Landlord's July 21, 2004 letter and $391.31 reported in

the 1999 CAM Reconciliation – amounted to $28,067.23.  At no point did Kmart ever receive

credit for this amount.  Briskey Aff., ¶ 25.

44.     On June 6, 2003, Landlord sent to Kmart the 2002 CAM Reconciliation.  The

2002 CAM Reconciliation consisted of only two pages, a cover letter and a single page chart of

seven categories of allocated expenses.  Briskey Aff., ¶ 26, Exhibit 11.

45.     It was not possible to derive the source of or verify the amounts allocated to

Kmart as part of the 2002 CAM Reconciliation by reference to any information provided therein.

Mansharamani Decl., Exhibit E (Campagna Depo.), pg. 53 - 55, lns. 3 - 8, pgs. 69- 70 lns. 12 – 8;

pgs. 75, lns. 7 – 23; pgs. 78 – 79, lns. 22 – 17.

46.     Kmart could not derive the source of or verify any of the amounts allocated to

Kmart as part of the 2002 CAM Reconciliation by reference to any information provided therein.

Briskey Aff., ¶ 27.

47.     Prior to sending to Kmart the 2002 CAM Reconciliation on June 6, 2003,

Landlord was aware of Kmart's ongoing dispute over inclusion of insurance and the property

manager's salary.  Landlord was aware that Kmart maintained its position that it was entitled to

the credits allocated to it in Malcolm Baker's March 2002 letter. Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 2, pgs. 132 -133, lns. 14 – 12.

48.    The CAM Rider provides that Kmart shall pay "for each calendar year" the common area charge "for such year." The CAM Rider also provides that "[a]s soon as is practicable after the end of each calendar year (or period) Landlord shall submit to Tenant a bill for the amount required to be paid by Tenant under this Rider. . . ." Mansharamani Decl., Exhibit B, CAM Rider, ¶¶ B, D.

49.    It had been the practice under the Lease to allocate as CAM charges expenses in the year that they were incurred. Mansharamani Decl., Exhibit G, Excerpted Transcript of Deposition of Donald Morissey ("Morissey Depo."), pg. 15.

50.    The 2002 CAM Reconciliation included amounts that were not allocable to the year 2002 such as $710 for the "removal and disposal of illegal dumps" done in 2001 and $1350 for "parking lot and sidewalk sweeping" done in 2001. Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 1, pg. 101, lns. 6 – 24; pg. 102, lns. 1 – 24.

51.    The 2002 CAM Reconciliation allocated to Kmart expenses such as maintenance staff salaries for staff spending only part of their time working on the Common Area and property manager salary for a property manager spending only part of his time working on the Common Area in the amount of $24,255.68, general administrative expenses in the amount of $7,821.33, and parking lot repairs in the amount of $750. Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 1, pgs. 108 - 112, lns. 11 – 14; pgs. 79 -85, lns. 18 – 11..

52.    The 2002 CAM Reconciliation allocated to Kmart expenses such as plumbing repairs, plumbing supplies, door repairs, roof repairs, and fire safety costs. Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 1, pgs. 113 - 127, lns. 19 – 18; pgs. 145 -146, lns. 2 – 10.

12

53.    The 2002 CAM Reconciliation allocated to Kmart property insurance for the entire property and some portion of liability insurance associated with an umbrella policy that was not backed out.  Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 2, pgs. 51 - 54, lns. 3 – 28; pgs. 64 – 66, lns. 8 - 12.

54.    As a general principle with respect to line items of the 2002 CAM Reconciliation, Landlord allocated expenses that "affect[ed] Kmart" or were allocated to Kmart in the 2002 CAM Reconciliation.  Exhibit D (Campagna Depo.), Vol. 1,  pgs. 64 - 65, lns. 24 – 9; pgs. 80 – 82, lns. 24 - 10.

55.    On August 12, 2003, Anne O'Neill, a Lease Administrator for Kmart, wrote to Campagna requesting that backup documentation be provided for the proposed 2002 CAM Reconciliation.  Briskey Aff., ¶ 28, Exhibit 12.

56.    On April 28, 2003, Landlord notified Kmart that the Landlord was adjusting the monthly CAM escrow amount for 2003 from $2,669 to $4,678.58, retroactive to January 1, 2003.  Landlord did not provide any reason for the increase or any supporting documentation.  Briskey Aff., ¶ 29, Exhibit 13.

57.    On August 12, 2003, Anne O'Neill indicated that Kmart had received the Landlord's letter requesting an increase to the monthly CAM escrows.  O'Neill requested supporting documentation to explain the increase.  Briskey Aff., ¶ 30, Exhibit 12.

58.    A large portion of the increase resulted from an increase in the insurance premium for coverage on the Assembly Square Mall through a different provider.  Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 2, pgs. 95 - 99, lns. 3 – 23.  However, Landlord did not provide any detail on that increase.  Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 2, pg. 97, lns. 1 – 23; pgs. 100 – 101, lns. 23 - 24.  Landlord was unable to indicate whether the

13

increased premium was associated with altered coverage. Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 2 pgs. 63 -64 , lns. 8 – 7. Further, the 2003 CAM escrow estimate was based on erroneous 2002 calculations. Mansharamani Decl., Exhibit E (Campagna Depo.), Vol. 2, pgs. 93 – 100, lines 23 – 3.

59.    On January 22, 2002, Kmart and its affiliates filed for Chapter 11 bankruptcy protection in federal bankruptcy court in Illinois.  By an order entered on April 23, 2003, the Bankruptcy Court for the Northern District of Illinois confirmed the plan of reorganization (the "Plan") by which Kmart and its affiliates emerged from Chapter 11 bankruptcy (the "Order"). The Effective Date of the Plan was May 6, 2003.  The Order in excerpted version is attached as Exhibit 2 to the Declaration of Mark Mackowiak ("Mackowiak Decl.").

60.    Under Section 12.5 of the Plan, on the Effective Date Kmart was "conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged from any Claim or Cause of Action existing as of the Effective Date."  The Plan, in excerpted version, is attached as Exhibit 1 to the Mackowiak Decl..

61.    On June 12, 2003, the Landlord filed a "Cure Claim" in the Bankruptcy Court for the Northern District of Illinois, seeking $44,747.56, corresponding, *inter alia*, to monthly CAM escrow payments from December 01, 2002 through June 1, 2003 and Pre-Petition Real Estate Taxes for 2002.  The Cure Claim (without exhibits) is attached as Exhibit 3 to the Mackowiak Decl..

62.    On August 8, 2003, Alvin Nathanson sent a letter to Kmart to Daryl Hurley's attention purporting to be a notice of default. The letter claimed that Kmart had failed to pay rent and other charges in the amount of $73,027.55. The letter indicated that $64,582.89 of that amount corresponded to "CAM," without any further detail as to what constituted "CAM."  The

14

letter also set forth a credit owed Kmart in the amount of $1,285.70 and an amount of $9,730.36 corresponding to "Real Estate Taxes," and again, did not explain further as to the derivation of those amounts. Briskey Aff., ¶31, Exhibit 14.

63.    Nathanson did not copy any employee in the Kmart Real Estate Department on that letter. Briskey Aff., ¶ 31, Exhibit 14.

64.    On August 22, 2003, Nathanson wrote to O'Neill and rejected Kmart's request for backup documentation for the CAM escrow increase in 2003 and for the 2002 CAM Reconciliation, claiming that Kmart had not disputed the June 6, 2003 invoice in time and that the Lease did not require backup documentation. Briskey Aff., ¶ 32, Exhibit 15.

65.    Between August 29, 2003 and September 15, 2003, Tracy Price of Kmart and agents of the Landlord communicated back and forth in an attempt to obtain additional detail and to resolve the dispute over the amount the Landlord claimed Kmart owed. On September 4, 2003, Tracy Price did receive some supporting documentation. Briskey Aff., ¶ 33, Exhibit 16.

66.    The Lease provided that the tenant must cure a noticed default within thirty days, *unless a longer period of time is reasonably necessary to cure.* Mansharamani Decl., Exhibit B, ¶ 25. On September 19, 2003, Kmart paid $42,107.22 to Landlord as a cure for amounts alleged to have been in default. Briskey Aff., ¶ 34, Exhibit 17.

67.    On September 16, 2003, Nathanson sent via certified mail a letter to Kmart to Daryl Hurley's attention purporting to be a notice of termination of lease. Briskey Aff., ¶ 35, Exhibit 18.

68.    Nathanson did not copy O'Neill or any other Kmart employees on that letter. Briskey Aff., ¶36.

15

Respectfully submitted,

KMART CORPORATION

By its attorneys,

Douglas H. Meal (BBO#340971)
Kristen Hanisch Mansharamani (BBO#655710)
ROPES & GRAY LLP
One International Place
Boston, MA 02110
(617) 951-7000

Dated: July __, 2004