

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASSEMBLY SQUARE LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>KMART CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 04CV10093(EFH)

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

RELEVANT PROCEDURAL HISTORY ............................................................................1

SUMMARY OF ARGUMENT ........................................................................................2

RELEVANT FACTS ....................................................................................................3

ARGUMENT ..............................................................................................................3

I.    AS OF THE DATE OF THE NOTICE OF DEFAULT, KMART DID NOT OWE THE
      LANDLORD *ANY* OF THE ITEMS THAT COMPRISE THE AMOUNT ALLEGED
      IN THE NOTICE........................................................................................3

      A. As Of The Date Of The Notice Of Default, Kmart Had No Liability Under
         The Lease For The 2002 CAM Charges Represented By Item 10 On The
         Delinquency Schedule.............................................................................4

         1.  The Landlord Failed to Adhere To The Terms Of The Lease In Calculating
             The 2002 CAM Charges Referenced In Item 10......................................5

             a.  Under The Express Terms Of The Lease, The Landlord Improperly
                 Allocated Insurance Premiums, Property Manager's Salary, And Various
                 Other Expenses Unrelated To Specified Outdoor Common Area
                 Maintenance To Kmart In Calculating Kmart's 2002 CAM Liability
                 Under The Lease.........................................................................5

             b.  The Consistent Course Of Prior Performance Under The Lease By
                 Landlord And Landlord's Predecessor In Interest Conclusively
                 Establishes That The Landlord Improperly Allocated Insurance Premiums
                 And Property Manager's Salary To Kmart In Calculating Kmart's
                 2002 CAM Liability.....................................................................7

         2.  The CAM Charges Represented By Item 10 Were Billed To Kmart Without
             Any Backup Documentation To Enable Kmart To Verify The Calculation, In
             Contravention Of The Lease Provisions.................................................10

         3.  Kmart Properly Objected To The CAM Charges Represented By Item 10 In
             Accordance With The Dispute Provisions In The Lease.............................12

4.  As Of The Date Of The Notice Of Default, Any Right Under The Lease That The Landlord Might Have Had To Recover The CAM Charges Represented By Item 10 Had Been Extinguished In The Kmart Chapter 11 Case, And The Landlord's Only Right To Recover Those Charges Was By Means Of Filing A Cure Claim Under The Plan.......................................14

B.  The CAM Escrow Charges Referenced In Items 2 Through 6 Of The Delinquency Schedule Were Not Due From Kmart As Of The Date Of The Notice Of Default, And In Any Event Kmart Timely Cured Any Default In Paying Those Charges......16

1.  Any Right The Landlord May Have Had Under The Lease To Recover The CAM Escrow Charges Represented By Items 2 Through 6 Was Extinguished By The Plan..................................................................................16

2.  Kmart Timely Cured Any Default That May Have Existed In Regard To Items 2 through 6 By Paying Those Items Within 30 Days Of Its Receipt Of Documentation Enabling Kmart To Understand Of The Components Of The Aggregate Amounts Alleged In The Notice Of Default..............................17

C.  The CAM Escrow Increases Referenced in Items 7 And 8 Of The Delinquency Schedule Were Not Due From Kmart As of The Notice Of Default, And In Any Event Kmart Timely Cured Any Default In Paying Those Charges....................19

1.  The CAM Escrow Increases Represented By Items 7 and 8 Were Calculated And Implemented In Violation Of The Lease Terms..................................................................................................19

2.  Any Right The Landlord May Have Had Under The Lease To Recover The CAM Escrow Increases Represented By Items 7 And 8 Was Extinguished By The Plan........................................................................20

3.  Kmart Timely Cured Any Default That May Have Existed With Regard To Items 7 and 8.......................................................................21

D.  The Increased CAM Escrow Charges Reflected In Items 9, 11 And 12 Of The Delinquency Schedule Were Not Due From Kmart As Of The Notice Of Default, And In Any Event Kmart Cured Any Default In Paying Those Charges...............22

1.  The Increased CAM Escrow Charges Represented By Items 9, 11, and 12 Were Calculated And Implemented In Violation Of The Lease Terms........22

2.  Any Amount That May Have Been Due Under The Lease As Of The Date Of The Notice Of Default In Respect Of Items 9, 11, And 12 Was More Than Offset By An Outstanding Credit Of $28,458.24 That Was Never Allocated To Kmart, But That Admittedly Was Due To Kmart, Resulting From The Landlord's Initial Failure To Calculate Kmart's CAM Liability In Accordance With The Lease For The Period

1999-2001...............................................................................23

3.  Kmart Timely Cured Any Default That May Have Existed With Regard
To Items 9, 11, and 12................................................................24

E.  Kmart Did Not Owe Landlord Item 1 As Listed In The Notice Of Default As Of
The Date Of That Notice, Because Any Right Under The Lease That The Landlord
May Have Had To Charge Kmart For The Real Estate Taxes Represented
By Item 1 Had Been Extinguished By The Plan.........................................25

II.  TO THE EXTENT THE LANDLORD INCORRECTLY CALCULATED EVEN A
PART OF EVEN ONE OF THE ITEMS COMPRISING THE AGGREGATE
AMOUNT ALLEGED IN THE NOTICE OF DEFAULT, THE NOTICE OF
DEFAULT  WAS INACCURATE AND, AS A RESULT, INVALID....................26

III.  EVEN IF THIS COURT DOES NOT ACCEPT SECTIONS I AND II SET
FORTH ABOVE, THE DEFAULT NOTICE WAS INVALID AND HENCE
COULD NOT BE THE PROPER BASIS FOR A TERMINATION OF THE
LEASE FOR A VARIETY OF REASONS.................................................27

A.  The Notice Of Default Lacked Sufficient Detail To Permit Kmart To Understand
The Amounts Purported To Be Due And, If Found To Be Accurate, To Cure Any
Default...............................................................................27

B.  The Notice of Termination Was Premature and, Thereby, Invalid....................28

C.  Notice of Default And The Notice Of Termination Were Sent By The
Wrong Person, Making Both Invalid For Yet Another Reason.........................28

CONCLUSION................................................................................29

Defendant Kmart Corporation ("Kmart"), by its undersigned attorneys, respectfully moves this Court pursuant to Fed. R. Civ. P. 56(d) for partial summary judgment. As detailed below, it is indisputable that the eviction claim contained in the plaintiff's summary process complaint is invalid as a matter of law. That claim should, therefore, be decided in favor of Kmart.

## RELEVANT PROCEDURAL HISTORY

Plaintiff Assembly Square Partnership (the "Landlord") commenced this action on September 22, 2003, by filing a summary process complaint (the "Complaint") in Somerville District Court. The Complaint alleges that Kmart is in breach of its obligations under the lease dated December 5, 1978 pursuant to which Kmart occupies its store located at the Assembly Square Mall in Somerville (the "Lease"). The relief sought in the Complaint includes (1) an order evicting Kmart from the Assembly Square Mall property and (2) a damage award equal to the amount of Kmart's alleged default.

On January 15, 2004, Kmart removed the action to this Court pursuant to 28 U.S.C. §1441(a), because the action falls within the Court's original subject matter jurisdiction under 28 U.S.C. §1332(a)(1) by reason of the fact that the action is between citizens of different states and involves a matter in controversy in excess of the sum or value of $75,000. This Court subsequently ordered that discovery be completed, and that dispositive motions be filed, by no later than July 30, 2004. Kmart now moves for partial summary judgment on the Landlord's eviction claim pursuant to Fed. R. Civ. P. 56(d). As demonstrated below, the Landlord's eviction claim is invalid as a matter of law, and Kmart's motion for partial summary judgment should accordingly be allowed.

## SUMMARY OF ARGUMENT

As summarized below, and as detailed in the Argument that follows, the Landlord's eviction claim is indisputably invalid as a matter of law for numerous independent reasons.

To begin with, the Landlord's eviction claim fails as a matter of law because *none* of the amounts specified in the August 8, 2003 notice of default on which the Landlord's eviction claim is predicated (the "Notice of Default") was in fact owed by Kmart to the Landlord under the Lease as of the date of the Notice of Default. See Point I *infra*. Moreover, even if the Court is not prepared to rule as a matter of law that *none* of the amounts specified in the Notice of Default was owed by Kmart to the Landlord under the Lease as of the date of the Notice of Default, it is certainly beyond dispute that as of that date Kmart was not liable under the Lease to the Landlord for the aggregate $73,027.55 amount alleged in the Notice of Default. The Notice of Default's indisputable overstatement of the amount owed by Kmart to the Landlord under the Lease as of the date of the Notice of Default in and of itself precludes the Landlord from terminating the Lease based upon the Notice of Default – regardless of whether Kmart owed the Landlord some lesser amount under the Lease as of the date of the Notice of Default – and hence in and of itself requires that the Landlord's eviction claim be resolved in favor of Kmart as a matter of law. See Point II *infra*. Further, wholly apart from the Notice of Default's erroneous assertion that Kmart owed the Landlord $73,027.55 under the Lease as of August 8, 2003, both the Notice of Default and the ensuing September 16, 2003 notice of termination (the "Notice of Termination") that the Landlord issued in reliance on the Notice of Default were invalid for a variety of other reasons. As a result, in order to resolve the Landlord's eviction claim, the Court need not even inquire into what if any amount was in fact owed by Kmart to the Landlord as of the date of the Notice of Default, because the Notice of Default and the Notice of Termination

are as a matter of law insufficient to sustain an eviction claim *even if* Kmart in fact owed the Landlord $73,027.55 under the Lease as of August 8, 2003 (which it indisputably did not). See Point III *infra*.

## RELEVANT FACTS

The facts that form the basis for Kmart's present motion are all undisputed and are set forth in Defendant's Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment dated July 30, 2004, and filed concurrently herewith ("Statement").

## ARGUMENT

**I.     AS OF THE DATE OF THE NOTICE OF DEFAULT, KMART DID NOT OWE THE LANDLORD *ANY* OF THE ITEMS THAT COMPRISE THE AMOUNT ALLEGED IN THE NOTICE.**

The Notice of Default asserts that, as of August 8, 2003, Kmart was in default under the Lease in the aggregate amount of $73,027.55. Statement ¶ 62. While it is impossible to determine from the Notice of Default itself what particular items comprise the aggregate alleged default of $73,027.55 (a circumstance that, as discussed in Point III *infra*, in and of itself renders the Notice of Default an invalid basis for terminating the Lease), the Landlord has subsequently explained that the $73,027.55 aggregate default alleged in the Notice of Default consists of Items 1-12 on the "Delinquency Schedule" attached to the Complaint (Statement ¶ 1), less a credit for "prepaid rent" of $1,285.70. As shown below, it is beyond dispute that as of August 8, 2003, Kmart was not liable under the Lease for *any* of the amounts referenced in Items 1-12 of the Delinquency Schedule. As a result, it is beyond dispute that Kmart was not liable under the Lease as of August 8, 2003 for *even one penny* of the $73,027.55 aggregate default asserted in the Notice of Default. This circumstance as a matter of law invalidates both the Notice of Default itself and the ensuing Notice of Termination. For this reason alone, then, Kmart is entitled to summary judgment on the Landlord's eviction claim.

**A.    As Of The Date Of The Notice Of Default, Kmart Had No Liability Under The Lease For The 2002 CAM Charges Represented By Item 10 On The Delinquency Schedule.**

Item 10 on the Delinquency Schedule asserts that Kmart is liable to the Landlord under the Lease for $24,835.12 pursuant to the "2002 CAM Reconciliation." Statement ¶¶ 1, 44. The 2002 CAM Reconciliation, sent to Kmart only on June 6, 2003, purports to calculate Kmart's common-area-maintenance ("CAM") liability under the Lease for the year 2002 and, based on that purported calculation, asserts that Kmart is liable under the Lease for additional 2002 CAM charges of $24,835.12. Statement. ¶ 44 . For four reasons, however, it is indisputable that as of August 8, 2003 Kmart had no obligation under the Lease to pay the Landlord the $24,835.12 amount referenced in the Landlord's 2002 CAM Reconciliation.

First, the calculation methodology followed by the Landlord in preparing the 2002 CAM Reconciliation violated the Lease and hence indisputably arrived at the wrong number for Kmart's 2002 CAM liability under the Lease. See Point I.A.1 *infra*. Second, the 2002 CAM Reconciliation lacked the reasonable supporting detail required by the Lease to enable Kmart's verification of its accuracy – a problem that the Landlord exacerbated when, rather than working with Kmart in an attempt to provide documentation enabling verification, the Landlord adopted the untenable position that no such cooperation was required by the Lease and, therefore, no such cooperation would be forthcoming. See Point I.A.2 *infra*. Third, Kmart disputed the 2002 CAM Reconciliation, which dispute by the very terms of the Lease relieved Kmart from any obligation to pay the amount claimed in the 2002 CAM Reconciliation unless and until the dispute had been resolved. Thus, even if the 2002 CAM Reconciliation was correct in amount (which it was not) and proper in form (which it was not), as of August 8, 2003 Kmart had no obligation under the Lease to pay that amount, because Kmart's dispute of that amount had not been resolved as of that date. See Point I.A.3 *infra*. Fourth, as of August 8, 2003, any obligation Kmart might

-4-

otherwise have had *under the Lease* in respect of the 2002 CAM charges referenced in Item 10

had been fully and finally extinguished by the plan of reorganization confirmed in the Kmart

Chapter 11 bankruptcy case, and the Landlord's sole vehicle for obtaining payment of such

charges was by pursuing a claim *under the Kmart reorganization plan*. Thus, regardless of

whatever obligation Kmart may have had as of August 8, 2003 under its reorganization plan in

respect of the 2002 CAM charges referenced in Item 10, Kmart indisputably cannot have been in

default *under the Lease* as of that date by reason of any failure by Kmart to pay those charges.

See Point I.A.4 *infra*.

1.    **The Landlord Failed To Adhere To The Terms Of The Lease In Calculating The 2002 CAM Charges Referenced In Item 10.**

a.    Under The Express Terms Of The Lease, The Landlord Improperly Allocated Insurance Premiums, Property Manager's Salary, And Various Other Expenses Unrelated To Specified Outdoor Common Area Maintenance To Kmart In Calculating Kmart's 2002 CAM Liability Under The Lease.

The Lease requires the Landlord to maintain the "outdoor Common Area" (Statement

¶ 4) and requires Kmart to reimburse the Landlord for a portion of the Landlord's expenses

associated with such maintenance. Statement ¶ 7. As shown below, the provisions of the Lease

that define how to determine Kmart's CAM reimbursement liability in regard to the Landlord's

outdoor Common Area CAM expense in any given year expressly prohibit allocation to Kmart of

several categories of expense that the Landlord allocated to Kmart in the 2002 CAM

Reconciliation. As a result, it is beyond dispute that the $24,835.12 CAM reimbursement charge

contained in the 2002 CAM Reconciliation was erroneously high. That being so, it is equally

beyond dispute that Kmart had no liability under the Lease as of August 8, 2003 to pay that

charge to the Landlord.

To begin with, the Lease specifically denies the Landlord any right to seek reimbursement from Kmart for "office overhead or salaries of persons whose functions extend beyond the care of the outdoor Common Area." Statement, ¶ 10. Yet, it is undisputed that in the 2002 CAM Reconciliation the Landlord treated as allocable to Kmart $7,821.33 of office overhead expenses and $24,255.68 of the salaries of the maintenance staff and the property manager, even though the responsibilities of the office staff, the maintenance staff, and property manager extended not only well beyond the outdoor Common Area of the Assembly Square Mall, but also well beyond the Assembly Square Mall property itself (i.e., to other properties as well). Statement, ¶ 51. The Landlord's inclusion of these amounts in calculating Kmart's 2002 CAM liability thus indisputably violated the Lease and indisputably resulted in the 2002 CAM charges represented by Item 10 being erroneously high.

In addition, the Lease specifically denies the Landlord any right to seek reimbursement from Kmart for public liability insurance premiums or for any property insurance premiums paid for coverage that extends to portions of the Assembly Square Mall property other than the outside Common Area. Statement, ¶¶ 9, 20. Yet, the $65,705.73 of insurance premiums that the Landlord allocated to Kmart in preparing the 2002 CAM Reconciliation indisputably included insurance premiums paid for property insurance on the *entire* Assembly Square Mall property (as opposed to just the outside Common Area) and indisputably included insurance premiums paid for a supplemental umbrella policy that provided liability insurance relative to the property. Statement ¶ 53. The Landlord's inclusion of these amounts in calculating Kmart's 2002 CAM liability thus violated the Lease and indisputably resulted in the CAM charges represented by Item 10 being erroneously high.

The 2002 CAM Reconciliation violated the Lease in numerous other respects. For example, while the Lease specifically denies Landlord any right to seek reimbursement from Kmart for plumbing repairs, roof repairs, door repairs and other repairs and maintenance associated with the interior of the property, Statement, ¶ 7, in the 2002 CAM Reconciliation the Landlord treated as allocable to Kmart a total of $24,255.68 of plumbing repairs, $2024.50 of roof repairs, $51.92 for a door repair, $812.50 for the fire safety system and $24.45 for other repairs and maintenance. Statement, ¶ 52. Similarly, while the Lease denies the Landlord any right to seek reimbursement from Kmart for parking lot patching, repairing and replacement, Statement, ¶ 11, in the 2002 CAM Reconciliation the Landlord treated as allocable to Kmart $750 for parking lot repair. Statement, ¶ 51. Further, while the Lease makes clear that the only expenses properly allocable to Kmart in the CAM Reconciliation for a given year are amounts paid by Landlord for *that* particular year, Statement, ¶ 8, in the 2002 CAM Reconciliation the Landlord treated as allocable to Kmart $1350 paid for "parking and sidewalk sweeping" done in 2001 and $710 paid for "removal and disposal of illegal dumps" done in 2001. Statement, ¶ 50.

In light of the numerous clear errors that the Landlord made in its own favor in preparing the 2002 CAM Reconciliation, there can be no dispute that the 2002 CAM Reconciliation was invalid when it was submitted by the Landlord to Kmart in June, 2003 and remained invalid on August 8, 2003, the date of the Notice of Default. As of that date, then, the Lease imposed no obligation on Kmart to pay the 2002 CAM charges referenced in Item 10 of the Delinquency Schedule.

        b.      The Consistent Course Of Prior Performance Under The Lease By Landlord and Landlord's Predecessor In Interest Conclusively Establishes That The Landlord Improperly Allocated Insurance Premiums And Property Manager's Salary To Kmart In Calculating Kmart's 2002 CAM Liability.

To the extent the Court has any doubt whether the Lease permits expenses for insurance, property manager salary, and office overhead to be allocated to Kmart in calculating Kmart's CAM liability under the Lease, the parties' course of performance should guide this Court's understanding of the meaning of the relevant terms of the Lease. See Mass. Gen. Laws ch. 106, § 2-208 cmt.2 (1999); Restatement (Second) of Contracts § 202 cmts. a, b (1981). Throughout the period from 1994 through 1998, Kmart was never once allocated even one penny of the property manager's salary when the Landlord's predecessor in interest, and later the Landlord itself, calculated Kmart's CAM Liability under the Lease. Statement, ¶ 17.[1] Review of the 1998 CAM Reconciliation makes this particularly clear. Statement, ¶ 17. Similarly, Kmart was never allocated any amounts for insurance in the CAM Reconciliations that the Landlord and its predecessor prepared for 1994 through 1998. Statement, ¶ 16.

The course of performance between Kmart and the Landlord's predecessor is particularly relevant because, as the original parties to the Lease, their course of performance reflects their understanding at the time of execution of the Lease. *See Jamesbury Corp. v. Worcester Valve Co.*, 443 F.2d 205 (1st Cir. 1971); *see also* 5-24 Corbin on Contracts §24.16 (2004) (stating that course of performance demonstrates that the parties adhere to a particular intention held at formation.) Indeed, "[t]here is no surer way to find out what parties meant when they entered into contract, than to see what they have done." *See Martino v. First National Bank of Boston*, 361 Mass. 325, 332 (1972). Here, moreover, because the Lease involved repeated occasions for performing the CAM liability calculation, and because each of those occasions resulted in the

---

[1] The Landlord took over ownership of the Assembly Square Mall property in October of 1998. Statement, ¶ 3. Therefore, the Landlord's predecessor prepared the 1994-1997 CAM Reconciliations, and the Landlord prepared the 1998 CAM Reconciliation, depicting separately and allocating separately to Kmart its charges for 1998 and those of its predecessor. Statement, ¶ 17.

exact same type of performance – i.e., on each occasion the property manager's salary and the insurance premiums were disregarded in calculating Kmart's CAM liability – the Court has before it an unambiguous course of performance that repeatedly was accepted or acquiesced in without objection and that, as a result, ought to carry especially great weight in the Lease interpretation. *See Keating v. Stadium Management Corp.*, 24 Mass.App.Ct. 246, 249 (1987); Mass. Gen. Laws ch. 106, § 2-208(1) (1999); Restatement (Second) of Contracts § 202(4) (1981). Thus, even if the Lease were ambiguous – which it is not – with regard to whether the salary of the property manager or property insurance premiums are allocable to Kmart in calculating Kmart's CAM liability, the prior performance by Kmart and the Landlord's predecessor would clarify that ambiguity in favor of Kmart.[2]

Finally, this Court need not rely solely on the course of performance of the Landlord's predecessor in conclusively determining the meaning of the Lease on this subject. As discussed above, the 1998 CAM Reconciliation prepared by the Landlord itself carried on the course of performance of Landlord's predecessor, by disregarding property manager salary and insurance premiums in calculating Kmart's CAM liability under the Lease, just as the Landlord's predecessor had done for the past four years. Statement, ¶ 17. Further, on March 22, 2002, the Landlord resolved Kmart's dispute of the Landlord's initial calculations of Kmart's CAM liability for the years 1999, 2000, and 2001 by admitting that neither the salaries of the property

---

[2] Because the Landlord stepped into the shoes of its predecessor when the Landlord accepted the assignment of the Lease, *see* Restatement (Second) of Contracts § 328(2) (1981), the Landlord necessarily became bound by any pre-existing course of performance under the Lease resolving any ambiguity about whether or not the salary of the property manager or insurance premiums for the property were allocable to Kmart in calculating Kmart's CAM liability. Indeed, if the Landlord were now allowed to start calculating Kmart's CAM liability based on charges that, prior to the assignment, all parties had understood were not allocable to Kmart, the value of the Lease to Kmart would be impaired by virtue of the assignment, an impermissible outcome. *See* Restatement (Second) of Contracts §333(1)(a) (1981).

manager, nor the property insurance premiums, were properly allocable to Kmart in calculating Kmart's CAM liability under the Lease. Statement, ¶¶ 27, 28 and 36. Thus, the interpretation of the Lease on these points that the Landlord has advanced in an effort to sustain the 2002 CAM charges referenced in Item 10 of the Delinquency Schedule is at odds not only with the language of the Lease itself, and not only with a four-year course of performance under the Lease during 1994 – 1997 by the Landlord's predecessor, but also with a second four-year course of performance under the Lease during 1998 – 2001 by the Landlord itself.[3]

> ## 2. The CAM Charges Represented By Item 10 Were Billed To Kmart Without Any Backup Documentation To Enable Kmart To Verify The Calculation, In Contravention Of The Lease Provisions.

The Lease expressly requires that a proposed CAM Reconciliation must "set forth in *reasonable detail*" the items and amounts included in Kmart's proposed CAM liability for the year in question and must set forth the "*method of calculating*" the CAM charge. Statement, ¶ 18. The Landlord's deposition testimony acknowledges that such a provision in the Lease is specifically intended to allow a tenant the ability to verify such charges. Statement, ¶ 19. The 2002 CAM reconciliation, however, in contrast to the Landlord's practice in prior years, failed to include the underlying invoices for the charges that the proposed CAM Reconciliation was

---

[3] The 2002 CAM Reconciliation was also erroneous insofar as it included expenses for maintenance performed in 2001, contrary to the Lease and the prior course of performance by the Landlord. The Lease provides that the CAM charges shall "be allocated to each calendar year" and shall include only "the expense for the maintenance of the Common Area . . . for such year." Statement, ¶ 48. Thus, any CAM charges that the Landlord incurred for maintaining the outdoor Common Area during 2001 were required by the Lease to be included in the 2001 CAM Reconciliation, regardless of when those expenses are actually paid by the Landlord. Consistent with that reading of the Lease, up through 2001 it was the practice of the Landlord to allocate CAM charges to the year for which they were incurred, rather then to the year in which they were paid. Statement, ¶ 49. This is further evidence that the amounts billed to the Landlord for work done in 2001 should not have been included as allocable to Kmart in the 2002 CAM Reconciliation.

allocating to Kmart.[4]  Statement, ¶ 44.  As a result, despite the fact that Kmart now knows

beyond a doubt, based on the Landlord's deposition testimony and the documents obtained in

discovery, that many of the amounts comprising the 2002 CAM Reconciliation were erroneously

billed, there was no way for Kmart to know this when it received the 2002 CAM Reconciliation.

Indeed, given the bare-bones nature of the Landlord's proposed 2002 CAM Reconciliation,

Kmart had no means of determining what the line items in that document even represented –

much less whether the amounts in those line items were properly allocable to Kmart.  Statement,

¶ 46.

On August 12, 2003, Kmart raised with the Landlord the lack of detail in the 2002 CAM

Reconciliation and requested supporting documentation to enable Kmart to verify the amount

charged.  Statement ¶ 55.  On August 22, 2003, the Landlord's counsel responded, informing

Kmart that his reading of the Lease yielded no source of a duty to provide supporting

documentation.  Statement, ¶ 64.  This reading of the Lease renders meaningless the Lease's

express requirement that a CAM Reconciliation set forth "in reasonable detail" the items

allocated as CAM charges to Kmart.  A contractual interpretation under which a negotiated

contract term is rendered meaningless is strongly disfavored.  It could not possibly have been the

intent of the parties that Kmart would have the choice of either paying without question every

penny of CAM charges that might be billed to it over the course of the multi-year Lease term or,

---

[4] While the text of the Lease, set forth *infra*, itself dispositively determines that the Landlord was
required to provide backup documentation of the CAM charges allocated to Kmart in the 2002
CAM Reconciliation, the Landlord's prior course of performance under the Lease confirms
Kmart's claim that the 2002 CAM Reconciliation was invalid absent such backup
documentation.  Specifically, both in 1999 and 2000 the Landlord's CAM Reconciliations
contained voluminous amounts of the very sort of backup documentation that the Landlord now
says it has no obligation to provide.  Statement, ¶ 13.

alternatively, being denied the documentation necessary to determine the validity of the Landlord's CAM charges should Kmart choose to dispute any such charges.

Because it indisputably lacked the supporting documentation necessary to enable Kmart to verify the accuracy of the CAM charges contained therein, the 2002 CAM Reconciliation was invalid and a nullity as a matter of law. Thus, even if the amount billed to Kmart in the 2002 CAM Reconciliation – Item 10 – had been properly calculated (which it was not, as shown above), Kmart was under no obligation under the Lease to pay that amount as of the date of the Notice of Default, because as of that date the Landlord had yet to submit to Kmart a 2002 CAM Reconciliation that contained the "reasonable detail" required by the Lease.

### 3.    Kmart Properly Objected To The CAM Charges Represented By Item 10 In Accordance With The Dispute Provisions In The Lease.

Under the Lease, if Kmart disputes a proposed CAM Reconciliation submitted by the Landlord, Kmart is not obligated to pay any amount requested in the proposed CAM reconciliation until the dispute is resolved. Statement, ¶ 26. Thus, because Kmart's dispute of the 2002 CAM Reconciliation had not been resolved at the time of the Notice of Default – and, indeed, has not been resolved as of today – Kmart was within its rights not to pay the 2002 CAM charges referenced in Item 10 upon receiving the 2002 CAM Reconciliation, and remains within its rights not to pay those charges today, wholly apart from whether the 2002 CAM Reconciliation correctly calculated those charges or contained the requisite supporting documentation for those charges.

The Landlord seeks to avoid this conclusion by pointing to the Lease's provision (see Statement, ¶ 26) that "[u]nless disputed, Tenant shall pay [the] amount [billed in a proposed CAM Reconciliation] to Landlord as additional rent within thirty (30) days of receipt thereof." According to the Landlord, this provision barred Kmart from disputing the 2002 CAM

-12-

Reconciliation unless Kmart delivered to the Landlord a written notice of such dispute within 30 days of Kmart's receipt of the 2002 CAM Reconciliation. Unfortunately for the Landlord, the above-quoted Lease provision in fact says no such thing. That provision does nothing more than provide a thirty-day time frame for payment of *undisputed* CAM charges. Nothing in the provision imposes on Kmart any deadline for disputing a proposed CAM Reconciliation or any required format for communicating such a dispute to the Landlord. Thus, it means nothing that Kmart did not send some sort of formal written "notice of dispute" to the Landlord within 30 days of receiving the 2002 CAM Reconciliation, because nothing in the Lease can be read to require such a notice in order to preserve Kmart's right to dispute the CAM charges contained in that reconciliation. Rather, all Kmart had to do in order to dispute the charges contained in the 2002 CAM Reconciliation was to refuse to pay them (which Kmart did).[5] Once such non-payment by Kmart created a dispute over the 2002 CAM Reconciliation, the Lease provision relied upon by the Landlord had no further potential application, and the governing term then became the Lease's separate provision that Kmart has no obligation to pay any *disputed* CAM charges unless and until the dispute is resolved.[6] Thus, even if the 2002 CAM Reconciliation

---

[5] The issue of whether Kmart gave the Landlord notice of its dispute of the 2002 CAM Reconciliation is a red herring for a second reason. In contravention of the Lease terms and the Landlord's March 2002 admission with respect to the CAM Reconciliations for 1999, 2000 and 2001, in the 2002 CAM Reconciliation the Landlord once again attempted to charge Kmart for insurance and the property manager's salary. Kmart's dispute of these allocations had been clearly recorded numerous times over the preceding three years. In fact, because of a conversation between Landlord's property manager and a Kmart employee in early May, Landlord was already aware that Kmart would dispute the 2002 CAM Reconciliation a month before it was sent on June 6, 2003. Statement, ¶ 47.

[6] This reading of the Lease is supported by Massachusetts law, which holds that when a delay in remitting a regional lease payment is due to "an honest difference of opinion between the parties on the method of computing" the charge, the delay is not a proper basis for termination of the lease. *Edward's Fine Furniture, Inc. v. DiTullio*, 356 Mass. 380 (1969); *see also In re 29 Newbury Street*, 856 F.2d at 427.

-13-