correctly calculated Kmart's 2002 CAM liability (which it did not) and contained the requisite

supporting documentation (which it did not), Kmart still had no obligation under the Lease to

pay those charges as of August 8, 2003, the date of the Notice of Default.

> **4.    As Of The Date Of The Notice of Default, Any Right Under The Lease That The Landlord Might Have Had To Recover The CAM Charges Represented By Item 10 Had Been Extinguished In The Kmart Chapter 11 Case, And The Landlord's Only Right to Recover Those Charges Was By Means Of Filing A Cure Claim Under The Plan.**

On January 22, 2002, Kmart and its affiliates filed for Chapter 11 bankruptcy protection

in federal bankruptcy court in Illinois. Statement, ¶ 59. By an order entered on April 23, 2003,

the Bankruptcy Court for the Northern District of Illinois confirmed the plan of reorganization

(the "Plan") by which Kmart and its affiliates emerged from Chapter 11. Statement, ¶ 59. The

Effective Date of the Plan was May 6, 2003. Statement, ¶ 59.

Under Section 12.5 of the Plan, on the Effective Date Kmart was "conclusively,

absolutely, unconditionally, irrevocably and forever, released and discharged from any Claim or

Cause of Action existing as of the Effective Date." Statement, ¶ 60. Section 1.26 of the Plan

defines "Claim" to include any claim against Kmart, *whether or not asserted*, as the word

"claim" is defined in Section 101(5) of the Bankruptcy Code. Statement, ¶ 60. Section 101(5) of

the Bankruptcy Code, in turn, defines the word "claim" to mean any "right to payment, whether

or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §

101(5)(A). Given these definitions, there can be no dispute that, as of May 6, 2003, any right the

Landlord might have had to obtain a payment from Kmart in respect of Kmart's CAM liability

under the Lease for 2002 was an "existing Claim" within the meaning of the Plan. As a result,

any right the Landlord might otherwise have had under the Lease to make a claim for the CAM

charges represented by Item 10 was released and discharged on May 6, 2003 pursuant to Section 12.5 of the Plan.

Section 12.5 of the Plan makes clear that the broad release of Claims contained therein was being given "in consideration for the obligations of [Kmart] under th[e] Plan." Statement, ¶ 60. Thus, while Kmart's liability under the Lease in respect of the CAM charges represented by Item 10 was definitively extinguished by Section 12.5 of the Plan, the Landlord received in exchange whatever rights it may have under the Plan to seek those amounts. In that regard, Section 8.2 of the Plan expressly provides that the sole right of a Landlord on an assumed lease in regard to provisions of the lease that "are or may be in default" is for the Landlord to seek "Cure". Statement, ¶ 60. Under Section 1.38 of the Code, "Cure" is defined as "an amount equal to all unpaid monetary obligations" under the lease in question, and under Section 8.2 of the Plan the only way for the Landlord to obtain "Cure" in regard to any amounts due under the Lease was for the Landlord to pursue a "Cure Claim" in the Bankruptcy Court for the Northern District of Illinois. Statement, ¶ 60.

On June 12, 2003, in recognition of the above-references provisions of the Plan, the Landlord filed a "Cure Claim" with regard to the Lease. Statement ¶ 61. The Landlord's Cure Claim expressly seeks, in Paragraph 5 thereof, the very same "year-end adjustments for CAM" that are represented by Item 10. Statement ¶ 61. In other words, by its own Cure Claim the Landlord has acknowledged that the CAM charges represented by Item 10 may no longer be recovered by the Landlord under the Lease and, instead, may now be recovered by the Landlord only by enforcing its right to Cure under the Plan. For this reason as well, then, it is beyond dispute that as of the date of the default notice, Kmart had no obligation under the Lease to pay the Landlord the CAM charges represented by Item 10.

**B.    The CAM Escrow Charges Referenced In Items 2 Through 6 Of The Delinquency Schedule Were Not Due From Kmart As Of The Date Of The Notice Of Default, And In Any Event Kmart Timely Cured Any Default In Paying Those Charges.**

While it was impossible to determine this from the Notice of Default itself, Kmart now knows that the $73,027.55 aggregate default alleged in the Notice of Default includes, among other charges, Items 2 through 6 on the Delinquency Schedule, which items refer to CAM escrow charges allegedly due under the Lease for the month of December 2002 and the months of January through May of 2003.  Statement, ¶¶ 1, 62.  For two reasons, the Landlord cannot predicate an eviction claim on the CAM escrow charges referenced in Items 2 through 6.  First, because any right the Landlord may have had under the Lease to recover the CAM escrow charges represented by Items 2 through 6 was extinguished by the Kmart plan of reorganization in May 2003, Kmart could not have been in breach of the Lease by reason of having failed to pay these charges when the Notice of Default was issued in August 2003.  See Point I.B.1. *infra*.  Second, even if Kmart could be found to have been in default under the Lease as of August 8, 2003 in regard to the CAM escrow charges referenced in Items 2 through 6, it is beyond dispute that Kmart timely cured any such default and that, as a result, any such default could not provide a valid basis for terminating the Lease.  See Point I.B.2 *infra*.

**1.    Any Right The Landlord May Have Had Under The Lease To Recover The CAM Escrow Charges Represented By Items 2 Through 6 Was Extinguished By The Plan.**

The CAM escrow charges for December 2002, January 2003, February 2003, March 2003 and April 2003 represented by Items 2 through 6, in like fashion to the 2002 CAM charges represented by Item 10, were all " existing Claims" within the meaning of the Plan as of May 6, 2003, the Effective Date of the Plan.  Thus, for the reasons stated in Point I.A.4. *supra*, the Plan released and extinguished any right the Landlord might otherwise have had under the Lease to

recover the CAM escrow charges represented by Items 2 through 6, and instead made the Landlord's right to obtain Cure under the Plan the Landlord's sole and exclusive means for obtaining payment of those charges.  The Landlord itself expressly acknowledged the foregoing points when, on June 12, 2003, it filed a Cure Claim with the Bankruptcy Court that, in Paragraph 4, expressly sought to recover under the Plan the very same CAM escrow charges represented by Items 2 through 6.  Statement, ¶ 61.  As a result, to the extent Kmart might otherwise have had liability under the Lease for any part of the CAM escrow charges represented by Items 2 through 6, by the date of the Notice of Default that liability indisputably had been 100% extinguished by the release contained in Section 12.5 of the Plan.  Therefore, the Notice of Default was invalid as a matter of law insofar as it was based on Items 2 through 6.

> **2.    Kmart Timely Cured Any Default That May Have Existed In Regard To Items 2 through 6 By Paying Those Items Within 30 Days Of Its Receipt Of Documentation Enabling Kmart To Understand Of The Components Of The Aggregate Amounts Alleged In The Notice Of Default.**

Despite the fact that Landlord was barred by Section 12.5 of the Plan from taking action under the Lease to collect the CAM escrow charges reflected in Items 2 through 6, on September 19, 2003 Kmart cured the purported default, not only with respect to the CAM escrow charges reflected in Items 2 through 6, but with respect to all other CAM escrow payments allegedly in default under the Lease as well.  Statement, ¶ 66.  Kmart took this action only out of an excess of caution, and it fully reserved its rights in so doing.

This cure payment was made timely under the Lease.  Under the Lease, in order to prevent the Landlord from becoming entitled to terminate the Lease by reason of a default, Kmart must cure the default within thirty (30) days of its receipt of notice of the default unless a longer period of time is reasonably needed to cure.  Statement, ¶ 66.  Here, even if the Notice of Default put Kmart on notice as of August 8, 2003 of the alleged default in regard to the CAM

escrow payments represented by Items 2 through 6 (which Kmart denies, as discussed in Point III, below), it is surely beyond dispute that the Notice of Default contained no itemization of the particular amounts comprising the aggregate $73,027.55 allegedly due under the Lease, and contained no supporting documentation for that alleged amount. Statement ¶ 62. Given this circumstance, any default that may have existed as of August 8, 2003 in regard to Items 2 through 6 was not a default that could reasonably be remedied within 30 days of the Notice of Default, because the Notice of Default did not give Kmart the information it needed to effect such a remedy. That being so, the Lease by its express terms gave Kmart "such additional time as shall be reasonably necessary to remedy [any] such default before th[e] [L]ease can be terminated...by the Landlord." Statement, ¶ 66.

Tracy Price of Kmart contacted Landlord August 29, 2003 – within the thirty day period after the August 8, 2003 Notice of Default -- to attempt to substantiate the amounts claimed.[7] Statement, ¶ 65. Kmart did not receive any supporting documentation until September 4, 2003, Statement, ¶ 65, and it paid the CAM escrow charges represented by Items 2 through 6 just fifteen days later, on September 19, 2003. Because Kmart's cure was effected well within the amount of additional time that was reasonably necessary for Kmart to remedy any default that may have existed as of August 8, 2003 in regard to the CAM escrow payments represented by Items 2 – 6, that cure indisputably was timely under the Lease, and as a result the Lease barred the Landlord from terminating the Lease based on any such default.

---

[7] To the extent any amounts were due, Kmart's records showed that those amounts were supposed to be resolved in a bankruptcy cure claim. If not so barred from resolution through the vehicle of Lease remedies, then, by Kmart's accounts all, or substantially all, of the amounts claimed to be due should have been subject to application of the substantial credit on Kmart's books of $28,067.23 even as of December 2002 (Point I.D.2., *supra*), as had been agreed by Landlord. So, substantiation of the notice of default was not only reasonably necessary but was imperative.

**C.**    **The CAM Escrow Increases Referenced in Items 7 And 8 Of The Delinquency Schedule Were Not Due From Kmart As of The Notice Of Default, And In Any Event Kmart Timely Cured Any Default In Paying Those Charges.**

While the Notice of Default itself did not provide this information, Kmart now knows that the $73,027.55 aggregate default alleged in the Notice of Default includes, among other charges, Items 7 and 8 on the Delinquency Schedule. Statement, ¶¶ 1, 62. Those items represent the Landlord's effort, on April 28, 2003, to increase the CAM escrow charge under the Lease from $2,669 per month to $4,678.58 per month for each month from January through May 2003. Statement, ¶ 56. For three reasons, it is beyond dispute that the CAM escrow increases represented by Items 7 and 8 cannot provide a basis for terminating the Lease. First, the CAM escrow increases represented by Items 7 and 8 were invalid under the Lease, so Kmart cannot have breached the Lease by refusing to pay them. See Point I.C.1 *infra*. Second, any right the Landlord may have had *under the Lease* to recover the CAM escrow increases represented by Items 7 and 8 was extinguished by the Kmart plan of reorganization on May 6, 2003. See Point I.C.2 *infra*. Third, even if Kmart could be found to have been in default under the Lease as of August 8, 2003 in regard to the CAM escrow increases reflected in Items 7 and 8, it is beyond dispute that Kmart timely cured any such default. See Point I.C.3 *infra*.

**1.**    **The CAM Escrow Increases Represented By Items 7 and 8 Were Calculated And Implemented In Violation Of The Lease Terms.**

In determining the monthly CAM escrow payment to be charged to Kmart for an upcoming year, the Lease requires the Landlord to make a reasonable estimate of total CAM reimbursement payment that will be due from Kmart at the end of that year. Statement ¶ 8. In part, that reasonable estimate takes into account prior year's CAM charges due and owing from Kmart at the end of the prior year. Statement, ¶ 8. Thus, the 2003 CAM escrow increases represented by Items 7 and 8 were calculated, in part, on the basis of the CAM reimbursement

charges billed to Kmart in the 2002 CAM Reconciliation.  Statement, ¶ 58.  As set forth in Point

I.A.1 *supra*, the 2002 CAM Reconciliation erroneously allocated to Kmart numerous expenses –

including but not limited to insurance premiums and property manager's salary.  Because the

Landlord's calculation of Kmart's 2002 CAM liability was grossly overstated, and because that

erroneous calculation was in turn used to calculate the CAM escrow increases represented by

Items 7 and 8, the amount of those increases necessarily must have been overstated as well.[8]

### 2.    Any Right The Landlord May Have Had Under The Lease To Recover The CAM Escrow Increases Represented By Items 7 And 8 Was Extinguished By The Plan.

The CAM escrow increases for January through May 2003 represented by Items 7 and 8

were all "existing Claims" within the meaning of the Plan as of May 6, 2003, the Effective Date

of the Plan, in like fashion to the 2002 CAM charges represented by Item 10 and the CAM

escrow charges represented by Items 2 through 6.  Thus, for the reasons stated in Points I.A.4

and I.B.1 *supra*, the Plan released and extinguished any right the Landlord might otherwise have

had *under the Lease* to recover the CAM escrow charges represented by Items 7 and 8, and

instead made the Landlord's right to obtain Cure *under the Plan* the Landlord's sole and

exclusive means for obtaining payment of those charges.  The Landlord itself expressly

acknowledged the foregoing points when, on June 13, 2003, it filed a Cure Claim with the

Bankruptcy Court that, in Paragraph 4, expressly sought to recover *under the Plan* the very same

---

[8] Additionally, during the course of discovery in this action, the Landlord admitted that a significant portion of the 2003 increase reflected in Items 7 and 8 resulted from the Landlord's changing its insurance policy to a carrier that charged a far larger premium.  Statement, ¶ 58. The Landlord was unable to indicate whether or not the coverage changed with the dramatic change in premium, and despite requests in discovery, Kmart has never received a copy of the underlying insurance plans.  Statement, ¶ 58.  Any change to insurance should not have been reflected in Kmart's CAM escrow charges.  Further, in accordance with the Lease, Kmart was entitled to notice of any change in insurance.  Statement, ¶ 6.  Kmart did not receive any such notice.  For these reasons as well, the CAM escrow increases represented by Items 7 and 8 were invalid under the Lease.

CAM escrow charges represented by Items 7 and 8. Statement, ¶ 60. As a result, to the extent Kmart might otherwise have had liability under the Lease for any part of the CAM escrow charges represented by Items 7 and 8, as of the date of the Notice of Default that liability indisputably had been 100% extinguished by the release contained in the Plan. For this reason as well, then, the Notice of Default was invalid insofar as it was based on Items 7 and 8.[9]

> ### 3.    Kmart Timely Cured Any Default That May Have Existed With Regard To Items 7 and 8.

As discussed in Point I.A.3, *supra*, on September 19, 2003 Kmart (acting in an excess of caution and reserving its rights in so doing) paid all of the CAM escrow charges then claimed by the Landlord to be in default under the Lease, including the CAM escrow increases represented by Items 7 and 8. For all of the reasons explained in Point I.A.3, by that payment Kmart timely cured any default that may have existed with respect to Items 7 and 8. Those items, therefore, provide no basis for a termination of the Lease, wholly apart from the other arguments advanced above.

> ### D.    The Increased CAM Escrow Charges Reflected In Items 9, 11 And 12 Of The Delinquency Schedule Were Not Due From Kmart As Of The Notice Of Default, And In Any Event Kmart Cured Any Default In Paying Those Charges.

Although one cannot tell this from the Notice of Default itself, Kmart now knows that the $73,027.55 aggregate default alleged in the Notice of Default includes, among other charges, Items 9, 11, and 12 on the Delinquency Schedule. Statement, ¶¶ 1, 62. Those items represent

---

[9] Even if this Court were to find, despite the foregoing arguments, that Items 7 and 8 discussed herein were due and owing under the Lease as of the date of the Notice of Default, Kmart's outstanding credit based on the Landlord's miscalculation of CAM charges more than offset the aggregate amount of Items 7 and 8. As set forth in Point I.D.2 *infra,* as of the Notice of Default Landlord owed Kmart a credit for 1999, 2000 and 2001 CAM miscalculations of a total of $58,472.34. Prior to December 1, 2002, Landlord had allocated only $30,013.80 of that amount to Kmart (by allocating that amount to the December 2001 through November 2002 escrow payments) leaving a credit in excess of $28,000 to be offset against Items 7 and 8 if they were in fact due.

the Landlord's effort to bill Kmart for the increased CAM escrow amount of $4,678.58 per month for each month from June through August 2003. Statement, ¶ 56. For three reasons, it is beyond dispute that the increased CAM escrow charges represented by Items 9, 11, and 12 cannot provide a basis for terminating the Lease. First, the increased CAM escrow charges represented by Items 9, 11, and 12 were invalid under the Lease, so Kmart cannot have breached the Lease by refusing to pay them. See Point I.D.1 *infra*. Second, as of the date of the Notice of Default, the $14,035.74 aggregate amount of the increased CAM escrow charges represented by Items 9, 11, and 12 was more than offset by the $28,458.24 credit that the Landlord still owed Kmart by reason of the Landlord's miscalculation of Kmart's CAM liability under the Lease for the years 1999, 2000, and 2001. See Point I.D.2 *infra*. Third, even if Kmart could be found to have been in default under the Lease as of August 8, 2003 in regard to the CAM escrow increases reflected in Items 9, 11, and 12, it is beyond dispute that Kmart timely cured any such default. See Point I.D.3 *infra*.

        1.     **The Increased CAM Escrow Charges Represented By Items 9, 11, and 12 Were Calculated And Implemented In Violation Of The Lease Terms.**

For the reasons set forth in Point I.C. *supra* in regard to the CAM escrow increases represented by Items 7 and 8, the increased CAM escrow charges represented by Items 9, 11, and 12 necessarily overstated Kmart's projected CAM liability for 2003 and hence were calculated in violation of the Lease. Therefore, Kmart was under no obligation under the Lease to pay Items 9, 11, and 12 at the time of the Notice of Default.

2.    **Any Amount That May Have Been Due Under The Lease As Of The Date Of The Notice Of Default In Respect Of Items 9, 11, And 12 Was More Than Offset By An Outstanding Credit Of $28,458.24 That Was Never Allocated To Kmart, But That Admittedly Was Due To Kmart, Resulting From The Landlord's Initial Failure To Calculate Kmart's CAM Liability In Accordance With The Lease For The Period 1999-2001.**

In March 2002, the Landlord acknowledged that Kmart was owed a credit of $58,472.34 in respect of Kmart's CAM Liability under the Lease for the period 1999-2001. Statement, ¶ 38. As the Landlord's acknowledgement letter recognizes, the reason for this credit being due was that the Landlord had admittedly miscalculated Kmart's CAM liability under the Lease during the 1999-2001 period. Statement, ¶¶ 27, 35 and 36. Nonetheless, despite the Landlord's clear acknowledgement in March 2002 that Kmart was due a CAM credit of $58,472.34 for the 1999-2001 period, by the date of the Notice of Default only $30,405.11 of that credit had been used by the Landlord to offset amounts otherwise due from Kmart to the Landlord under the Lease. Statement, ¶¶ 42. Therefore, as of the date of the Notice of Default. Kmart still had an "unamortized" credit balance of at least $28,067.23 ($58,472.34 less $30,405.11). That credit balance was more than sufficient to cover the aggregate amount of the June through August increased CAM escrow charges represented by Items 9, 11, and 12 ($14,035.74 for the three months). Thus, even if Kmart had been liable under the Lease for Items 9, 11, and 12 as of the date of the Notice of Default (which was not the case), as of that date any such liability was more than offset by the credit due Kmart of $28,458.24, and as a result of any liability represented by Items 9, 11 and 12 could in no event have resulted in Kmart being in default under the Lease as of the date of Notice of Default.

Given the Landlord's March 22, 2002 letter acknowledging Kmart's entitlement to a $58,472.34 credit in respect of its CAM liability for 1999-2001, the Court need not inquire whether, under the Lease, Kmart was in fact entitled to such a credit. The March 22, 2002 letter

constitutes behavior that is clearly inconsistent with an understanding that the credit due to Kmart was merely $30,013.80 and, as such, constitutes a waiver of the Landlord's right to maintain such a position. Specifically, the Landlord voluntarily relinquished its right to enforce its prior interpretation of the Lease through its behavior in revising its prior CAM Reconciliations so that they contradicted what Landlord had asserted, prior to the waiver, in regard to the amount of the CAM credit due to Kmart. Statement, ¶¶ 27, 35 and 36. In the case of such a contradiction, the waiver controls. *See* 1 FRIEDMAN ON LEASES § 16.501 at 1139 (4th ed. 1997).

Malcolm Baker testified by deposition that if, when he sent the revised CAM Reconciliations on March 22, 2002, he did not believe Kmart to have been correct, then he provided the revised credits because he thought that the issue was not one worth fighting about. Statement, ¶ 27. In either event, his actions on behalf of the Landlord constituted a waiver. Formal rules of waiver are designed precisely to prevent the waiving party from "lulling another into a belief that strict compliance with a contractual duty will not be required, and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction." 13 WILLISTON ON CONTRACTS § 39:15 (4th ed. 2003). There can be no dispute, then, regarding Kmart's entitlement to the full $58,472.34 credit reflected in Mr. Baker's letter dated March 22, 2002.

### 3. Kmart Timely Cured Any Default That May Have Existed With Regard To Items 9, 11, and 12.

As discussed in Point I.A.3, supra, on September 19, 2003 Kmart (acting in an excess of caution and reserving its rights in so doing) paid all of the CAM escrow charges then claimed by the Landlord to be in default under the Lease, including the increased CAM escrow charges represented by Items 9, 11, and 12. For all the reasons explained in Point I.A.3, by that payment

Kmart timely cured any default that may have existed with respect to Items 9, 11, and 12. Those items, therefore, provide no basis for a termination of the Lease, wholly apart from the other arguments advanced above.

### E. Kmart Did Not Owe Landlord Item 1 As Listed In The Notice Of Default As Of The Date Of That Notice, Because Any Right Under The Lease That The Landlord May Have Had To Charge Kmart For The Real Estate Taxes Represented By Item 1 Had Been Extinguished By The Plan.

Like the 2002 CAM charges represented by Item 10 and the various CAM escrow charges represented by Items 2 through 8, the real estate tax charge represented by Item 1 on the Delinquency Schedules was an "existing Claim" within the meaning of the Plan as of May 6, 2003, the Effective Date of the Plan. Thus, for the reasons stated in Points I.A.4 *supra*, the Plan released and extinguished any right the Landlord might otherwise have had *under the Lease* to recover the real estate tax charge represented by Item 1, and instead made the Landlord's right to obtain Cure *under the Plan* the Landlord's sole and exclusive means for obtaining payment of that charge. The Landlord itself expressly acknowledged the foregoing points when, on June 13, 2003, it filed a Cure Claim with the Bankruptcy Court that, in Paragraph 4, expressly sought to recover *under the Plan* the very same real estate tax charge represented by Item 1. As a result, any liability Kmart might otherwise have had under the Lease to pay the $9,730.36 real estate tax charge represented by Item 1 was 100% released on May 6, 2003 pursuant to Section 12.5 of the Plan. The Notice of Default therefore was invalid insofar as it was based on Item 1.

## II. TO THE EXTENT THE LANDLORD INCORRECTLY CALCULATED *EVEN A PART* OF *EVEN ONE* OF THE ITEMS COMPRISING THE AGGREGATE AMOUNT ALLEGED IN THE NOTICE OF DEFAULT, THE NOTICE OF DEFAULT WAS INACCURATE AND, AS A RESULT, INVALID.

The Notice of Default alleges a default as of August 8, 2003 in the aggregate amount of $73,027.55. Even if the arguments advanced in Point I above do not enable the Court to conclude that Kmart was not in default under the Lease *at all* when the Notice of Default was

issued, the foregoing agreements surely leave no doubt that Kmart was not in default under the Lease in the full aggregate amount of $73,027.55 as of August 8, 2003. Thus, whatever lesser amount Kmart may have been liable for under the Lease as of that date, it cannot be disputed that the Notice of Default inaccurately overstates the aggregate amount of any such default that may have existed as of the date.

According to Massachusetts law, notices of default must be accurate in order to become the basis for a valid termination of lease. In *Oakes v. Monroe*, 62 Mass. 282 (1851), the Supreme Judicial Court considered a complaint brought to recover possession of premises occupied by a tenant under a written lease on the grounds that the lease had been determined by a notice to quit. The Court held that a proceeding to recover possession could not be maintained if that proceeding was predicated upon a notice to quit "forthwith" because that demand did not conform to the Massachusetts notice to quit statute. The Court stated that if a notice of default "contains any specification of the time when the tenant is required to quit the premises, it should specify it truly, otherwise it would serve to mislead him, and thus defeat the very purpose for which it was intended." *Oakes,* 62 Mass. at 286. The Court further explained its rationale as follows:

> A notice to quit, under the statute, is a distinct act upon which important rights and consequences are made to depend. It must, therefore, be sufficient and perfect of itself without reference to any subsequent proceedings. It is not made to depend upon them for its validity, but they upon it. The argument by which the plaintiffs seek to sustain the validity of the notice, in this case, would make the sufficiency of a notice to quit to depend not upon is own intrinsic validity but the proceedings which are to follow it. Such a construction would defeat the main object in requiring a notice to be given to the tenant, for he would then be left to wait for the commencement of the summary proceedings, in order to ascertain the object of his lessor in giving him the notice.

*Id.* at 287.

By analogy, the inclusion of an erroneous amount in a notice of default invalidates the notice. Citing *Oakes*, the Court in *In re 29 Newbury Street, Inc.*, 75 B.R. 650, 656-57 (D. Mass. 1987), refused to enforce a notice of default that referenced an inaccurate amount due. In so ruling, the Court was not moved by the Landlord's argument that Mass. Gen. Laws Ann. ch. 186, § 11 does not mandate the inclusion of the amount of rent claimed by the landlord in a notice to quit. *See id*; *see also In re 29 Newbury Street*, 856 F.2d 424 (1st Cir. 1988). Thus, the indisputable fact that the Notice of Default was inaccurate in the amount of the aggregate default alleged thererin necessarily compels the conclusion that the Notice at Default was invalid and hence cannot sustain a termination of the Lease.

**III.  EVEN IF THIS COURT DOES NOT ACCEPT SECTIONS I AND II SET FORTH ABOVE, THE DEFAULT NOTICE WAS INVALID AND HENCE COULD NOT BE THE PROPER BASIS FOR A TERMINATION OF THE LEASE FOR A VARIETY OF REASONS.**

**A.  The Notice Of Default Lacked Sufficient Detail To Permit Kmart To Understand The Amounts Purported To Be Due And, If Found To Be Accurate, To Cure Any Default.**

Not only does Massachusetts require that a notice of default be accurate, but also that a notice be specific enough to allow the tenant to cure the default. *See e.g. Oakes*, 62 Mass. at 287 (holding that a notice to quit must be sufficient and perfect of itself without reference to subsequent proceedings). The Landlord's purported Notice of Default was insufficient of itself in that it lacked any specificity. Kmart only determined the amounts comprising the total alleged default through subsequent efforts to communicate with the Landlord. The August 8, 2003 letter claimed that Kmart was in default in the aggregate amount of $73,027.55 and indicated that $64,582.89 of that amount corresponded to "CAM," without any further detail as to what constituted the allegedly unpaid "CAM." The letter also set forth a credit owed Kmart in the amount of $1,285.70 and an amount of $9,730.36 corresponding to "Real Estate Taxes" and,

again, did not explain further as to the derivation of those amounts. Cryptic descriptions of this sort do not give a tenant any meaningful notice of the default the tenant is supposed to cure. As a result, the Notice of Default did not constitute a valid notice of default under the Lease and hence as a matter of law could not serve as a valid basis for an ensuing termination of the Lease.

**B.**     **The Notice of Termination Was Premature and, Thereby, Invalid.**

As set forth herein, despite Kmart's requests, Kmart received no supporting documentation substantiating the Notice of Default until September 4, 2003. As a result, the earliest date on which Kmart truly had notice of the alleged defaults in question was on September 4, 2003. Under the Lease, a default may not become the basis for a termination of the Lease until "thirty (30) days after notice to tenant of such default." Statement ¶ 66. Given that provision, the earliest date on which the Landlord could have terminated the Lese based on the defaults alleged in the Notice of Default was October 4, 2003. As a result, the Notice of Termination, which was sent on September 16, 2003, was premature and invalid.

**C.**     **The Notice of Default And The Notice Of Termination Were Sent By The Wrong Person, Making Both Invalid For Yet Another Reason.**

A notice of default or termination is ineffective when sent by an attorney for the landlord rather than the landlord himself, unless the attorney is named in the lease as authorized to act for the landlord in such matters, has dealt with the tenant on previous occasions, or where the notice of default or termination is authenticated or accompanied by proof of the attorney's authority to bind the landlord in the giving of such notice. *See* FRIEDMAN ON LEASES, §16.2 at 1054 citing *Siegel v. Kentucky Fried Chicken of Long Island, Inc.*, 108 A.D.2d 218, 220 (N.Y. App. Div. 1985). Here, Nathanson was not named in the Lease as authorized to act for the Landlord, nor had he ever dealt with Kmart previously on the Landlord's behalf, and neither the purported notice of default nor the purported notice of termination were authenticated or accompanied by

-28-

proof of the attorney's authority to bind the landlord in the giving of such notices.  Accordingly, the Notice of Default and the Notice of Termination were invalid and ineffective for this reason as well.

## CONCLUSION

For <u>any or all</u> of the foregoing reasons, namely: 1) the inaccuracy of the amounts alleged in the Default Notice and, therefore, the invalidity of the Default Notice itself; 2) the invalidity of the Default Notice for its lack of specificity and procedural deficiencies; and 3) Kmart's timely cure of the alleged default, this Court should render partial summary judgment in favor of Kmart and should dismiss with prejudice Landlord's claim for eviction.

Respectfully submitted,

KMART CORPORATION

By its attorneys,

Douglas H. Meal (BBO#340971)
Kristen Hanisch Mansharamani (BBO#655710)
ROPES & GRAY LLP
One International Place
Boston, MA 02110
(617) 951-7000